J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Karen Gutierrez*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KAREN GUTIERREZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE SOLOMON-PAGE GROUP LLC, a New York limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION** |

## INTRODUCTION

1. Plaintiff, on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant The Solomon-Page Group LLC ("Defendant" or "TSPG"). TSPG is a leading staffing and executive search firm headquartered in New York City, with offices across the United States. TSPG maintains offices in Los Angeles and San Diego, California. It actively recruits individuals residing in California for positions based in the state.

2. Defendant has installed and deployed social media/advertising platform software on its website, located at http://solomonpage.com/– (the "Website") – to secretly collect data about visitors to the Website, their devices, locations and activity to identify who they are, target them with unwanted marketing and track them on an ongoing basis.

3. The social media/advertising platform software uses the collected data to identify visitors to the Website, and often matches it with additional data about visitors already in the possession of social media/advertising platforms. The social media/advertising platforms – here, at minimum, LinkedIn and Meta – already have extensive information about many individuals residing in California. The additional data may include such things as their names and email addresses.

4. Both Defendant on the one hand, and LinkedIn and Meta, on the other, benefit commercially and financially from this activity. Defendant benefits because collected visitor data, and the visitors' uncovered identities, are used to, *inter alia*, target specific visitors with ads for Defendant's services and positions. LinkedIn and Meta benefit because they can build profiles – or enhance ones they have already created – which can be exploited commercially. These companies' access to visitor data/identities is precisely what attracts companies like TSPG to their platforms for marketing efforts.

5. Defendant's installation and use of social media/advertising platform software without obtaining consent or authorization violated California Penal Code

§ 638.51, California's Trap and Trace Law and duties under applicable common law Defendant owed to Plaintiff and other visitors to the Website similarly situated to her.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

7. This Court has specific personal jurisdiction over Defendant with respect to all claims asserted in this action.

8. Defendant TSPG is a New York limited liability company headquartered in New York City. It maintains two offices in California, one in Los Angeles, and one in San Diego. It recruits individuals to fill positions based all across California. A search of "Job Opportunities" based in California listed on the Website conducted on August 4, 2026, on the webpage, https://opportunities.solomonpage.com/, retrieved 62 California-based positions. This number represents approximately one-half the number of New York-based positions retrieved by a search conducted on the same date and webpage.

9. Defendant maintains ongoing commercial relationships with such California customers and residents. Defendant derives substantial revenue from California-based transactions through its operation of the Website. Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website. Defendant intended and understood that such persons would suffer injury in California.

10. LinkedIn and Meta are both California-headquartered companies.

Defendant availed itself of the software, services and platforms of LinkedIn and Meta to identify individuals in California for purposes of targeted recruitment and advertising.

11. Defendant's use of the LinkedIn software and advertising services is governed by a User Agreement that contains two provisions that tie this action to California. First, the User Agreement provides that any legal dispute between Defendant and LinkedIn relating to LinkedIn's code and services is governed by California law.[1] Second, it provides that all claims and disputes between Defendant and LinkedIn "can be litigated only in the federal or state courts in Santa Clara County, California, USA" and that Defendant "agree[s] to personal jurisdiction in those courts."

12. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District. Moreover, a substantial part of the events giving rise to the claims raised in this action occurred within this District.

## PARTIES

13. Plaintiff Karen Gutierrez ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

14. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify

[1] *See* https://www.linkedin.com/legal/user-agreement (last viewed 8/4/2026).

these entities when Defendant's discovery responses reveal their true names and roles.

15. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## **<u>FACTUAL ALLEGATIONS</u>**

16. Defendant owns and operates the Website, which it uses, *inter alia*, to recruit members of the public for professional positions located in California.

17. The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking on a link or typing the Website's address into the browser address bar), and the time the Website loads on the visitor's screen. (This location gathering occurs separately and apart from the social media/advertising platform code running on the Website that forms the basis of Plaintiff's claims in this action.) Therefore, Defendant had at the very least constructive knowledge that the social media/advertising platform code on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website from California similarly situated to her, while they were located in California. It had such knowledge during the time the violations alleged herein occurred.

18. On November 19, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to LinkedIn and Meta. This occurred through the operation of software and code on the Website.

## Defendant Shares Visitors' Data with at least 2 Social Media/Advertising Platforms

19. Defendant has partnered with at least two social media/advertising platforms in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to LinkedIn and Meta on the Website.

20. The LinkedIn and Meta code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the LinkedIn and Meta code identifies visitors through "browser fingerprinting." Fingerprinting allows social media companies LinkedIn and Meta to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including the visitor's geolocation, device information, identification and cross-referencing of malicious cookies installed on the visitor's devices, and other traits evident from the visitor's browsers.

## Browser Fingerprinting and Third-Party Tracking

21. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings are transmitted to LinkedIn and Meta? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

22. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those social media companies who you are. (These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.) Social media companies may already have access to your name and email addresses, as well as other websites you have

visited in the past, to combine and/or match with this incoming data from your device.

23. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

24. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to ***third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of visitors.*** The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

25. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[2]

26. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.[3]

27. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[4] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad

---

[2] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 8/4/2026).

[3] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[4] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 8/4/2026).

behaviors, essentially establishing the relationship between web tracking and fingerprinting."[5]

28. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

[5] *Id.*

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**LinkedIn Code**

29. LinkedIn is an advertising juggernaut. It earns billions each year through advertising its customers products and services on the LinkedIn social media platform. To accomplish this, it must collect tremendous amounts of data from individuals browsing the internet, identifying them, and building (and later enhancing) profiles on them.

30. Defendant installed and configured the LinkedIn code on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn for Defendant's benefit, all without visitors' knowledge or consent.

31. LinkedIn's own promotional materials for the LinkedIn code explicitly state that the technology "unlocks powerful demographic insights about your website visitors, including their job titles, companies, industries, and more."

32. The LinkedIn code installed on the Website collects and relies on device- and browser-related data that seems merely technical and innocuous but that are frequently used to confirm a website visitor's identity. These include such minor things as browser type, version, and configuration settings, operating system architecture/version information, and display characteristics such as screen resolution and color depth. As alleged supra, an individual can be identified based on such data, particularly when a company like LinkedIn has the individual's approximate location.

33. The LinkedIn code specifically targets data elements that create unique digital signatures for individual users, including Plaintiff and members of the putative class. The Software causes an identifier (LinkedIn Ads ID, li_adsid) to be added into visitors' browsers (which exist on their devices) that is "persistent" – meaning it can last months or even years after the visitor's visit to a website ends.

The persistent identifier(s) loaded onto a visitor's browser on her device links her visits to different websites, what she buys on them, pages she selects to view, and information she enters to a unified advertising profile of her. This profile is used to track when she makes purchases and to target her with ads for a website operator's products when she goes to other websites. This is referred to as "retargeting."

34. LinkedIn also represents to customers like Defendant that it uses the profiles to reach visitors across devices. Defendant installed this software on its Website to enable reliable visitor identification and long-term tracking across multiple website sessions.

35. LinkedIn explains that installing the code "creates cookies" and a first-party pseudonymous identifier on visitors' browsers, supporting LinkedIn's ability to build website audiences for retargeting and to perform conversion tracking tied to member accounts.

36. LinkedIn publicly discloses to potential customers like Defendant that the "Personalized Advertising" cookies part of the LinkedIn code include:

(a) UserMatchHistory, used for an ID synchronization process and storing the last sync time;

(b) li_sugr, used to make a probabilistic match of a website visitor's identity; and

(c) _guid, used to identify a LinkedIn member for advertising through Google ads (relevant where the visitor is a LinkedIn member and the cookie is applicable).

37. The UserMatchHistory cookie, using the persistent identifiers that are loaded onto a visitor's device by the LinkedIn code, allows LinkedIn to match up visits to different websites that deploy the LinkedIn code and tie them to a single individual.

38. Defendant's decision to deploy LinkedIn's tracking code on the Website integrates Defendant's Website into LinkedIn's advertising identity-matching and audience-building ecosystem.

39. By deploying the LinkedIn code, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com. LinkedIn itself identifies (at minimum) snap.licdn.com and px.ads.linkedin.com as domains associated with the LinkedIn code's operation. Defendant configured the LinkedIn code to automatically route data and signals that contain a visitor's data to LinkedIn's infrastructure.

40. Plaintiff was subjected to the LinkedIn code as described *supra* starting when she requested that the Website load on her device on November 19, 2025.

**Meta Code**

41. The Meta code performs data collection, behavioral analysis, user retargeting, and analytics. It uses a sophisticated algorithm to track people, recently described by Meta whistleblowers as "absolutely relentless in the pursuit of people."[6]

42. The Meta code allows Meta to obtain and store at least the following visitor data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).

43. Meta utilizes the data collected through the Meta code for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as ***ad targeting and retargeting***, in which Meta

[6] Craig Clough, *Meta Doesn't Understand Its Own Algorithms, Ex-VP Testifies* (Law360.com Feb. 19, 2026), available at https://www.law360.com/articles/2443857 (last visited 6/8/2026).

uses the Meta code to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. The profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's audience network. Meta also uses the data for ***conversion tracking***, in which Meta uses the Meta code to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter. Data is also used for "Audience Insights and Analytics," a feature by which Meta provides data to businesses on user demographics, interests, and behaviors across their sites and apps. Meta also uses the data for ***cross-device and cross-platform tracking***, in which Meta uses the Meta code to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This feature ensures that advertisers can follow users across devices.

**Troubling Implications of Third-Party Data Sharing**

44. Companies using third-party tracking software – such as the LinkedIn and Meta code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to social media platforms will be used solely for advertising purposes.

45. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora

> utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

46. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[7]

47. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[8]

48. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[9]

49. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that

[7] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last viewed 6/8/2026).

[8] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[9] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[10]

50. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[11]

51. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[12]

**Data and Related Profiles of Consumers Have Economic Value**

52. The type of visitor data transmitted via the Website to LinkedIn and Meta have economic value – as is obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the LinkedIn and Meta code on the Website.

53. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors

[10] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 8/4//2026).

[11] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 8/4/2026).

[12] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 8/4/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 8/4/2026).

to Defendant's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[13]

54. As recently explained by the Law Institute:[14]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its

[13] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 8/4/2026).

[14] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 8/4/2026).

> predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

55. There exists an established market for the type of personal data collected and transmitted through the LinkedIn and Meta code running on the Website – data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## CLASS ALLEGATIONS

56. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of the LinkedIn and Meta code running on the Website.**

57. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

58. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

59. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;

b. Whether Plaintiff and Class members are entitled to statutory damages;

c. Whether Plaintiff and Class members are entitled to punitive damages;

d. Whether Plaintiff and Class members are entitled to injunctive relief;

e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

60. TYPICALITY: Plaintiff was subjected to the LinkedIn and Meta code running on the Website when she visited the Website on November 19, 2025. As a result, her data was transmitted to LinkedIn and Meta, and possibly other third parties, for fingerprinting, identification and tracking purposes. Her claims are therefore typical of the Class.

61. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

62. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law, Cal. Penal Code § 638.51

63. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

64. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

65. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

66. Each of the LinkedIn and Meta code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

67. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

68. Each of the LinkedIn and Meta code is designed to identify the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "***sources***" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

69. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Biglang-Awa-Castro v. SBE Restaurant Group,*

*LLC*, 25VECV03590, 2026 Cal. Super. LEXIS 29752, at *3-4 (L.A. Co. Super. Ct. Apr. 16, 2026); *Schallert v. RocketGenius*, 25STCV35081, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. March 24, 2026); *Hassid v. Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Lucky Opco LLC,* 25STCV03961, 2026 Cal. Super. LEXIS 24132, at *5-6 (L.A. Co. Super. Ct. Jan. 5, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1030-32 (C.D. Cal. 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Santoro v. Lulu & Georgia, Inc.*, 25STCV11722, 2025 Cal. Super. LEXIS 84529, at *8-9 (L.A. Co. Super. Ct. Nov. 21, 2025); *Zhizhi Xu v. Reuters News & Media, Inc.*, 25CV459918, 2025 Cal. Super. LEXIS 76169, at *8-10 (Santa Clara Co. Super Ct. Oct. 24, 2025); *Scarlett v. Future US, LLC*, CGC-25-621912, 2025 Cal. Super. LEXIS 56166, at *11-14 (S.F. Co. Super. Ct. Sept. 5, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. The Data Brokers Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

70. Defendant did not obtain a court order before using or installing the LinkedIn and Meta code on the Website. Defendant also did not obtain consent from

Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

71. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through LinkedIn and Meta.

72. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

73. Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

74. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

75. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## <u>SECOND CAUSE OF ACTION</u>

### Intrusion Upon Seclusion

76. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

77. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

78. Defendant's deployment of the LinkedIn and Meta code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed LinkedIn and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

79. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the LinkedIn and Meta code on the Website.

80. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

81. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

82. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the LinkedIn and Meta code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

83. The intrusion described herein would be highly offensive to a reasonable person.

84. Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

85. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are therefore entitled to compensatory damages, which includes monetary damages.

86. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the LinkedIn and Meta code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

87. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## PRAYER

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. An award of statutory damages pursuant to CIPA;

3. An award of punitive damages;

4. An award of nominal damages;

5. An order for full restitution;

6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: August 4, 2026 TAULER SMITH LLP

By: ____________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Karen Gutierrez*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: August 4, 2026

TAULER SMITH LLP

By: ______________________

J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Karen Gutierrez*